# EXHIBIT 2

LAW OFFICE

DON L. SMITH^
GREGORY L. CASHION
RICHARD M. SMITH
JEFFERSON C. ORR
H. BRENT PATRICK
VIC L. McCONNELL*†**
S. JOE WELBORN††

# SMITH CASHION & ORR, PLC

ONE AMERICAN CENTER
3100 WEST END AVENUE, SUITE 800
NASHVILLE, TENNESSEE 37203
www.smithcashion.com

TELEPHONE (615) 742-8555
FACSIMILE (615) 742-8556

(615) 742-8586
DIRECT DIAL NUMBER
jwelborn@smithcashion.com

WILLIAM L. FITTS
BRENDEN T. HOLBROOK
BLAKE E. CREEKMUR
JOSEPH A. TISONE
ALEXANDER TRUJILLO
COLIN W. HALEY
SHANNON M. HUSSEY

^ (Deceased)
†  ALSO LICENSED IN KY
†† ALSO LICENSED IN LA
*  ALSO LICENSED IN OH
** ALSO LICENSED IN WVA

November 8, 2024

**VIA FEDEX**
Liberty Mutual Insurance Company
175 Berkley Street
Boston, MA 02116

Re: **NOTICE OF PERFORMANCE BOND CLAIM**
   Project: Apison Plant Phase C Expansion – Phase 2 Modifications
   Contractor/Principal: O'Neal Constructors, LLC
   Owner/Obligee: McKee Foods Corporation
   Surety: Liberty Mutual Insurance Company
   Performance Bond No.: 018228358

To Whom It May Concern:

Please be advised that our law firm, along with the law firm of Chambliss, Bahner & Stophel, P.C., have been engaged to represent McKee Foods Corporation ("McKee") in connection with the above-referenced project.[1]  Liberty Mutual Insurance Company's ("Liberty Mutual") principal, O'Neal Constructors, LLC ("O'Neal"), is the general contractor for the referenced Project.

Notwithstanding the fact that O'Neal has been paid all monies owed to it under the parties' contract and has been provided opportunity after opportunity by McKee to fulfill its contractual obligations, O'Neal has failed at every turn to timely perform and complete its scope of work on the Project.   Indeed, substantial completion of the Project was achieved in November 2023, yet one (1) year later, work remains incomplete, and punch list items are still outstanding.

In addition to the remaining work, O'Neal is also liable to McKee for $906,000 in direct costs incurred by McKee as a result of O'Neal's failure to complete project tasks on schedule, liquidated damages of $1.5 million, consequential damages of $250,000, as well as attorney's fees, costs and interest. These damages will only increase if O'Neal continues with its refusal to complete the Work.

---

[1] Accordingly, please direct all future communications regarding the above-referenced matter to me via e-mail with a copy to Tim Gibbons (TGibbons@chamblisslaw.com).

As Liberty Mutual is aware, McKee demanded that O'Neal complete all of its scope of work on the referenced Project (*see demand letter attached hereto as* **Exhibit A**, which was e-mailed to Jarrod Stone on October 29, 2024).[2]  This demand was preceded by numerous emails from McKee to O'Neal requesting that O'Neal complete its work.  While O'Neal has responded to McKee's demand letter with overtures of intentions to complete all outstanding work, the fact is that O'Neal has done nothing to address these outstanding work items, all of which should have been completed over six (6) months ago.

Bottom line, the work needs to be completed, either by O'Neal or under the Performance Bond.  As such, McKee is considering declaring a Contractor Default and is hereby asserting a claim against the Performance Bond issued by Liberty Mutual (Bond No. 018228358).  A copy of said Performance Bond is attached hereto as **Exhibit B**. McKee requests that Liberty Mutual take appropriate steps under the Performance Bond and make arrangements to timely complete O'Neal's scope of work on the Project.

We look forward to your immediate attention to this matter.  Notwithstanding the above, McKee reserves all rights, remedies and/or defenses whether arising in equity, contract or by operation of law.

Sincerely,

SMITH CASHION & ORR

By: _____

S. Joe Welborn

SJW
Enclosures

cc:     Chris Hennen via email
        Tim Gibbons via email
        Christina Craddock via email Christina.Craddock@LibertyMutual.com
        Jarrod Stone via e-mail jstone@manierherod.com
        Co-Counsel for O'Neal - Tim Mickel via e-mail tmickel@ehhlaw.com
        Co-Counsel for O'Neal - Ward Lambert via email wlambert@hlpwlaw.com

---

[2]     As a continuation of settlement discussions, this letter attached hereto as **Exhibit A** is subject to Rule 408 and we are providing it to you without waiving any of McKee's rights under Rule 408.

# EXHIBIT A

DON L. SMITH^
GREGORY L. CASHION
RICHARD M. SMITH
JEFFERSON C. ORR
H. BRENT PATRICK
VIC L. McCONNELL*†**
S. JOE WELBORN††

LAW OFFICE
## Smith Cashion & Orr, PLC
ONE AMERICAN CENTER
3100 WEST END AVENUE, SUITE 800
NASHVILLE, TENNESSEE 37203
www.smithcashion.com

WILLIAM L. FITTS
BRENDEN T. HOLBROOK
BLAKE E. CREEKMUR
JOSEPH A. TISONE
ALEXANDER TRUJILLO
COLIN W. HALEY
SHANNON M. HUSSEY

| TELEPHONE | (615) 742-8555 |
| FACSIMILE | (615) 742-8556 |

(615) 742-8586
DIRECT DIAL NUMBER
jwelborn@smithcashion.com

^ (Deceased)
†  ALSO LICENSED IN KY
†† ALSO LICENSED IN LA
*  ALSO LICENSED IN OH
** ALSO LICENSED IN WVA

October 25, 2024

*VIA EMAIL mcarpenter@onealinc.com*
Mr. Mac Carpenter
Executive Vice President
O'Neal Constructors, LLC
10 Falcon Crest Drive
Greenville, SC 29607

> Re: Dispute between McKee Foods Corporation ("McKee") and O'Neal Constructors, LLC's ("O'Neal") arising from AIA A102 Standard form of Agreement Between Owner and Contractor, dated December 11, 2020 ("Agreement"), as modified.

Dear Mr. Carpenter:

Please be advised that our law firm, along with the law firm of Chambliss, Bahner & Stophel, P.C., have been engaged to represent McKee Foods Corporation ("McKee"). Accordingly, please direct all future communications regarding the above-referenced matter to me via e-mail with a copy to Tim Gibbons (TGibbons@chamblisslaw.com).

McKee is in receipt of your letter to Jake Stone dated September 26, 2024. Please accept this letter as McKee's response to the same.

## A. McKee's Assessment of O'Neal's Change Orders is Consistent with the Terms of the Parties' Agreement

Your assertion that McKee is "without proper cause" in its lack of approval of O'Neal's pending change order claims lacks any merit. As sophisticated entities, McKee and O'Neal negotiated at arms-length with equal bargaining power the terms and conditions of their Agreement. The Agreement established mandatory procedures that O'Neal had to follow to assert and to preserve its equitable adjustment and change order claims. At every turn, however, O'Neal failed to follow these procedures and has either waived these claims or is estopped from pursuing them.

As you know, after entering into the Agreement on December 11, 2020, McKee and O'Neal entered into the "Modification – Phase 2" to the Agreement dated April 16, 2021 (the "Phase 2 Modification") for O'Neal to perform the Phase 2 Work[1] on the Project. Under the Phase 2

---

[1] All capitalized terms used herein shall have the same meanings as set forth in the Agreement.

Modification, O'Neal guaranteed that the Contract Sum for completion of the Phase 1 and 2 Work would not exceed of $105,494,580.00 (the "GMP"), subject to additions and deductions by Change Order as provided in the Contract Documents.

Phase 2 Work began on or about May 17, 2021. Thereafter, on June 1, 2021, O'Neal and McKee executed Addendum No. 2 to the Agreement, which incorporated a revised Construction Schedule and Milestone Dates for Phase 1 and 2 Work in to the Agreement. Per Addendum No. 2, executed almost six weeks after the parties executed the Phase 2 Modification, O'Neal agreed that the Project would be "Ready for Owner Equipment Installation" by November 1, 2022 and that O'Neal would achieve Substantial Completion of Phase 2 Work by February 23, 2023.

By December 15, 2021, certain site stabilization work, including rigid inclusions, was underway. As Phase 2 construction continued, O'Neal notified McKee that the GMP would increase, based on the equitable adjustment provision set forth in Section 5.2.1 of the Agreement, as modified by the Phase 2 Modification. O'Neal brought this to McKee's attention when O'Neal began buying out the Project with its subcontractors.

Thereafter, McKee's Jake Stone had numerous discussions with O'Neal's project representatives, advising O'Neal that in order to increase the GMP, O'Neal needed to put forth a proposal for a "total buyout" of the Phase 2 project. In other words, O'Neal had to confirm the total escalation in cost to complete Phase 2 from bid time in Fall 2020 to subcontract execution time in late 2021.

On February 9, 2022, based on O'Neal's numerous representations to McKee of the total cost escalation to complete the Phase 2 project, the parties executed Change Order 005 in the amount of $18,679,442.22. Under Change Order 005, O'Neal and McKee mutually agreed to the equitable adjustment for construction cost increases and cost reconciliations from September 2020 (bid time) to O'Neal's subcontract execution with its subcontractors. See Contract Change Order 005 for reference.

Notwithstanding the parties' execution of an $18.6 million plus equitable adjustment change order and McKee's payment of the same, through no fault of McKee, O'Neal failed to have Phase 2 "Ready for Owner Equipment Installation" by November 1, 2022 and failed to achieve Substantial Completion of Phase 2 Work by February 23, 2023. Instead, precast wall construction on Phase 2 was completed by April 5, 2023, the concrete slab on Phase 2 was completed by May 25, 2023, and the roof installation was completed by June 29, 2023.

O'Neal's failure in this regard is due entirely to the following:

a) O'Neal left off, or under scheduled, significant scopes of work from its Construction Schedule;

b) O'Neal did not manage its subcontractors to the scheduled completion dates in the Construction Schedule; and

c) O'Neal management did a poor job of buying out comprehensive scopes of work with their subcontractors apparently leaving scope gaps to fill in and manage under its GMP contract that were not covered by Change Order 005.

As you must know, neither Section 5.2.1 nor any other provision in the parties' Agreement gives O'Neal *carte blanche* rights to an equitable adjustment for additional costs allegedly incurred by O'Neal and its subcontractors on this Project. Rather, Section 5.2.1 of the Agreement, as modified, limits O'Neal's entitlement to an equitable adjustment to the following circumstances which arise only if an O'Neal subcontractor refused to honor "estimates and pricing received by [O'Neal] in the Fall 2020" due to:

- Changes from IFB Drawings;
- Length of time between the date of estimate and subcontract award;
- Commodity price escalation and/or commodity delivery date impacts after the estimate;
- General conditions cost impacts due to later completion dates.

Under the *ejusdem generis* rule of contract interpretation recognized in Tennessee, by listing **only** circumstances in which a subcontractor refused to honor its Fall 2020 pricing, O'Neal and McKee excluded any claims for equitable adjustment that do not arise from a subcontractor refusing to honor its Fall 2020 pricing.

The parties' Agreement is also devoid of any provision that affords O'Neal the right to recover additional costs it now seeks, all of which are a direct result of O'Neal's own mismanagement of this Project. Accordingly, O'Neal and its subcontractors are not entitled to recover costs from McKee for the extended time spent on the Project completing missed or under-scheduled scopes of work or to recover costs that relate to scope gaps in subcontracts.

Moreover, it is clear that O'Neal's change order claims do not comply with claims procedures set forth in the parties' Agreement. Specifically, without prior approval from McKee (written or otherwise), O'Neal apparently committed the claimed additional costs to its subcontractors autonomously and then much later (more than 1 year in some cases) presented the costs to McKee for payment via a change request. This is a risk that O'Neal assumed, as § 7.1.2 of the A201 General Conditions clearly states that "any increase in the Contract Sum must be approved in writing by McKee."

Notwithstanding these facts which demonstrate O'Neal's failure to comply with the claims procedures set forth in the Agreement, it is our understanding that during meetings on May 10 and September 27, 2023, O'Neal gave McKee verbal updates of potential additional costs, beyond the "buyout" Change Order 005, of $4.3 million and $6.6 million, respectively. Then, as late as March 12, 2024, O'Neal represented to McKee that the additional costs would not exceed $9.35 million, but then switched course and presented written notice to McKee on April 10, 2024 of an unsubstantiated/unsupportable claim for $19.7 million, more than double the amount represented by O'Neal less than a month earlier.

The mandatory claims procedures set forth below from the A201 General Conditions govern O'Neal's equitable adjustment and change order claims:

**§ 1.6.2 Notice**. Notice of claims as provided in Section 15.1.3 shall be provided in writing and shall be deemed to have been duly served only if delivered to the designated representative of the party to whom notice if addressed by certified or registered mail, or by courier providing proof of delivery.

**§ 15.1.1 Definition**. A claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, a change in the Contract Time, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract.

**§ 15.1.3.1 Notice of Claims**. Claims by either the Owner or Contractor, where the condition giving rise to the Claim is first discovered prior to the expiration of the period for correction of the Work set forth in Section 12.2.2., shall by initiated by notice to the other party.

**§ 15.1.5 Claims for Additional Cost**. If the Contractor wishes to make a Claim for an increase in the Contract Sum, ***notice as provided in Section 15.1.3 shall be given <u>before</u> proceeding to execute the portion of the Work that is the subject of the Claim***....

In accordance with § 15.1.5 the A201 General Conditions, O'Neal was obligated to provide written notice to McKee of an increase in the Contract Sum "before proceeding to execute the portion of the Work that is the subject of the Claim." The summary timeline set forth above shows that the Work was nearing completion before O'Neal ever gave written notice of its claim for an increase in the Contract Sum by way of an alleged equitable adjustment. Accordingly, since O'Neal's change order claims and claims for equitable adjustment relate to Work performed prior to submission of O'Neal's April 10, 2024 written notice of claim, said claims are barred by the express provisions of the parties' contract.

Additionally, § 9.2 of the A201 General Conditions obligated O'Neal to provide and update a Schedule of Values "allocating the entire Contract Sum to the various portions of the Work." The Schedule of Values must be updated periodically in order to track the approved change orders, and it is used as the basis for reviewing O'Neal's pay applications (per § 9.2 of the A201 General Conditions). On this Project, the last pay application from O'Neal is dated July 2, 2024, and is for the period up through June 30, 2024. It reflects a total updated Contract Sum of $139,564,684.30, and the spreadsheet attached to the pay application allocates that entire sum, in great detail, to the various components of the project. This is yet another reason justifying McKee's unwillingness to approve either O'Neal's equitable adjustment claim or change order claims.

### B. O'Neal's Failure to Complete the Work is a Material Breach of the Agreement

In Jake Stone's September 20, 2024 letter to you, Mr. Stone made it clear to O'Neal that McKee's July 11, 2024 settlement adjustment offer had been withdrawn. Mr. Stone also made it clear that unless O'Neal provided unequivocal written confirmation to McKee that O'Neal (and its subcontractors) would complete the Work on the Project, including all punch list items and the repairs needed for the roof warranty, that McKee would not consider another settlement adjustment offer.

Since your September 26, 2024 letter was anything but the unequivocal written confirmation requested by McKee, McKee will not consider making another settlement offer at this time. Not only does McKee believe that O'Neal's claims are barred by the parties' Agreement, but also believes that it is owed damages from O'Neal. Such damages include, but are not limited to, estimated direct labor damages of $906,000, liquidated damages of $1.5 million, consequential damages of $250,000, attorney's fees, costs and interest. These damages will only increase if O'Neal continues with its refusal to complete the Work.

All this to say, before McKee will consider meeting with O'Neal to discuss O'Neal's claims, O'Neal must first complete the Work as required by the Contract Documents. McKee's position in this regard is consistent with § 15.1.4.1 of the A201-2017 General Conditions, pursuant to which O'Neal agreed to diligently perform the Work pending final resolution of a Claim. Conversely, O'Neal's refusal to complete the Work until McKee approves some or all of O'Neal's pending change order claims violates the agreed upon terms of the parties' contract.

Please accept this letter as written demand from McKee pursuant to § 2.5 of the A201 General Conditions to complete and finish all of the Work, including the Work identified in Mr. Stone's letter, within ten days of your receipt of this letter. Failure to do so, will result in McKee exercising its rights under the performance bond with Liberty Mutual.

Assuming O'Neal completes the Work and still wants to meet to explore resolution, O'Neal must present to McKee a reasonable settlement demand in the general vicinity of McKee's previous generous offer. Otherwise, my client does not see the point in conducting such a settlement meeting. Moreover, please be advised that if O'Neal wants a mediation, McKee's starting point will be zero or nominal, not the $5.7 million previously offered.

Please be advised that if O'Neal does not complete the Work as requested herein in a timely manner, my client has informed me that it will exercise its audit rights under Article 11 of the parties' Agreement. This audit would include O'Neal's production of records of the cost of the project, invoices from subcontractors, estimates from subcontractors, subcontract agreements and payments to subcontractors.

This letter is part of compromise negotiations in accordance with Rule 408 of the Tennessee and Federal Rules of Evidence, should be treated as confidential, and will not be admissible in any action or proceeding. This letter is only a partial statement of McKee's position. McKee reserves all of its rights under its contract with O'Neal, under the Payment and Performance Bonds, and under applicable law.

Very truly yours,

SMITH CASHION & ORR, PLC

By: _____

S. Joe Welborn

October 25, 2024
Page 6

Cc:    Tim Gibbons via e-mail
       Client

# EXHIBIT B

 **Liberty Mutual.** SURETY

Bond No. 018228358

# Performance Bond

**CONTRACTOR:**
*(Name, legal status, and address)*

O'Neal Constructors, LLC
PO Box 10269
Greenville, SC 29603

**OWNER:**
*(Name, legal status, and address)*
McKee Foods Corporation
10260 McKee Rd.
Collegedale, TN 37315

**CONSTRUCTION CONTRACT**
Date: April 16, 2021

**SURETY:**
*(Name, legal status, and principal place of business)*
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

**MAILING ADDRESS FOR NOTICES:**

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

Amount: $79,285,356.00    Seventy Nine Million Two Hundred Eighty Five Thousand Three Hundred Fifty Six Dollars and 00/100

Description:
*(Name and location)* Apison Plant Phase C Expansion - This bond only covers the Work which is defined in the Contract Documents as "Phase 2 of the Project as delineated in the Phase 2 Modification and the Phase 2 Contract Documents".

**BOND**
Date: May 5, 2021
*(Not earlier than Construction Contract Date)*

Amount: $79,285,356.00    Seventy Nine Million Two Hundred Eighty Five Thousand Three Hundred Fifty Six Dollars and 00/100

Modifications to this Bond:    ☐ None        ☐ See Section 16

| **CONTRACTOR AS PRINCIPAL** | **SURETY** |
|---|---|
| Company:          *(Corporate Seal)* | Company: |
| O'Neal Constructors, LLC | Liberty Mutual Insurance Company |
| Signature: | Signature: *Adrian C Burchett* |
| Name and Title:  PRESIDENT | Name and Title: Adrian C. Burchett    Attorney-In-Fact |

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address, and telephone)*

**AGENT or BROKER:**

McGriff Insurance Services, Inc.
P.O. Box 8628
Columbia, SC 29202

803-748-0100

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer, or other party:)*

Init.

/

LMS-20875 02/21

Liberty Mutual Surety vouches that the original text of this document conforms exactly to the text in AIA Document A312-2010 Edition Performance Bond

Case 1:26-cv-00110    Document 1-2    Filed 04/28/26    Page 10 of 18    PageID #: 30

1

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1 the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2 the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3 the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

**§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2 Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text in AIA Document A312-2010 Edition Performance Bond.

LMS-20875 02/21

§ 7 If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

    .1    the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

    .2    additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

    .3    liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§ 8 If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

§ 9 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

§ 10 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 11 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 12 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

§ 13 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

## § 14 Definitions
§ 14.1 **Balance of the Contract Price.** The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 14.2 **Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

§ 14.3 **Contractor Default.** Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

§ 14.4 **Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

§ 14.5 **Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

§ 15 If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**Init.**

/

Liberty Mutual Surety vouches that the original text of this document conforms exactly to the text in AIA Document A312-2010 Edition Performance Bond.

LMS-20875 02/21

**§ 16** Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |

Signature: _____  
Name and Title:  
Address:

Signature: _____  
Name and Title:  
Address:

Init.

/

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text in AIA Document A312–2010 Edition Performance Bond.

LMS-20875 02/21



Bond No. 018228358

# Payment Bond

**CONTRACTOR:**
*(Name, legal status, and address)*

O'Neal Constructors, LLC
PO Box 10269
Greenville, SC 29603

**OWNER:**
*(Name, legal status, and address)*
McKee Foods Corporation
10260 McKee Rd.
Collegedale, TN 37315

**SURETY:**
*(Name, legal status, and principal place of business)*
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

**MAILING ADDRESS FOR NOTICES:**

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**CONSTRUCTION CONTRACT**
Date: April 16, 2021

Amount: $79,285,356.00    Seventy Nine Million Two Hundred Eighty Five Thousand Three Hundred Fifty Six Dollars and 00/100

Description:
*(Name and location)*  Apison Plant Phase C Expansion - This bond only covers the Work which is defined in the Contract Documents as "Phase 2 of the Project as delineated in the Phase 2 Modification and the Phase 2 Contract Documents".

**BOND**
Date: May 5, 2021
*(Not earlier than Construction Contract Date)*

Amount: $79,285,356.00    Seventy Nine Million Two Hundred Eighty Five Thousand Three Hundred Fifty Six Dollars and 00/100

Modifications to this Bond:        ☐ None        ☐ See Section 18

**CONTRACTOR AS PRINCIPAL**
Company:                *(Corporate Seal)*
O'Neal Constructors, LLC

Signature:
Name
and Title: PRESIDENT

**SURETY**
Company:
Liberty Mutual Insurance Company

Signature: Adrian C. Burchett
Name      Adrian C. Burchett
and Title: Attorney-In-Fact

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address, and telephone)*
**AGENT or BROKER:**

McGriff Insurance Services, Inc.

P.O. Box 8628

Columbia, SC 29202

803-748-0100

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer, or other party:)*

Init.

/

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text in AIA Document A312-2010 Edition Payment Bond.

LMS-20875 02/21

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,

> **.1** have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
>
> **.2** have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

Init.

/

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text

LMS-20875 02/21

§ 10 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

§ 11 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 12 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 13 Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

§ 14 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 15 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

### § 16 Definitions
**§ 16.1 Claim.** A written statement by the Claimant including at a minimum:
- .1 the name of the Claimant;
- .2 the name of the person for whom the labor was done, or materials or equipment furnished;
- .3 a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
- .4 a brief description of the labor, materials or equipment furnished;
- .5 the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
- .6 the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
- .7 the total amount of previous payments received by the Claimant; and
- .8 the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

**§ 16.2 Claimant.** An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor,materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity thathas rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

**§ 16.3 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

**Init.**

/

LMS-20875 02/21

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text in AIA Document A312-2010, Payment Bond

Case 1:26-cv-00110   Document 1-2   Filed 04/23/26   Page 16 of 18   PageID #: 36   7

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

**CONTRACTOR AS PRINCIPAL**

Company: *(Corporate Seal)*

**SURETY**

Company: *(Corporate Seal)*

Signature: _____

Name and Title:

Address:

Signature: _____

Name and Title:

Address:

Init.

/

**Liberty Mutual Surety** vouches that the original text of this document conforms exactly to the text in AIA Document A312–2010 Edition Payment Bond.

LMS-20875 02/21

**Liberty Mutual SURETY**

This Power of Attorney limits the acts of those named herein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company
West American Insurance Company

Certificate No: **8204174 - 018002**

# POWER OF ATTORNEY

**KNOWN ALL PERSONS BY THESE PRESENTS:** That The Ohio Casualty Insurance Company is a corporation duly organized under the laws of the State of New Hampshire, that Liberty Mutual Insurance Company is a corporation duly organized under the laws of the State of Massachusetts, and West American Insurance Company is a corporation duly organized under the laws of the State of Indiana (herein collectively called the "Companies"), pursuant to and by authority herein set forth, does hereby name, constitute and appoint, Adrian C. Burchett, Alfred T. Johnson, Camille Smith, Duainette H. Cullum, Lori J. Kelly, Marcus Stevens, Marian C. Newman, Robert J. Lavisky, Wesley V. Dasher, Jr.

all of the city of _____Columbia_____ state of _____SC_____ each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents and shall be as binding upon the Companies as if they have been duly signed by the president and attested by the secretary of the Companies in their own proper persons.

**IN WITNESS WHEREOF,** this Power of Attorney has been subscribed by an authorized officer or official of the Companies and the corporate seals of the Companies have been affixed thereto this __27th__ day of _____August_____, 2020,

 

Liberty Mutual Insurance Company
The Ohio Casualty Insurance Company
West American Insurance Company

By: _David M. Carey_
David M. Carey, Assistant Secretary

State of PENNSYLVANIA
County of MONTGOMERY ss

On this __27th__ day of ____August____, 2020 before me personally appeared David M. Carey, who acknowledged himself to be the Assistant Secretary of Liberty Mutual Insurance Company, The Ohio Casualty Company, and West American Insurance Company, and that he, as such, being authorized so to do, execute the foregoing instrument for the purposes therein contained by signing on behalf of the corporations by himself as a duly authorized officer.

**IN WITNESS WHEREOF,** I have hereunto subscribed my name and affixed my notarial seal at King of Prussia, Pennsylvania, on the day and year first above written.



**COMMONWEALTH OF PENNSYLVANIA**
Notarial Seal
Teresa Pastella, Notary Public
Upper Merion Twp., Montgomery County
My Commission Expires March 28, 2021
Member, Pennsylvania Association of Notaries

By: _Teresa Pastella_
Teresa Pastella, Notary Public

This Power of Attorney is made and executed pursuant to and by authority of the following By-laws and Authorizations of The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company which resolutions are now in full force and effect reading as follows:

**ARTICLE IV – OFFICERS: Section 12. Power of Attorney.**
Any officer or other official of the Corporation authorized for that purpose in writing by the Chairman or the President, and subject to such limitation as the Chairman or the President may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Corporation to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Corporation by their signature and execution of any such instruments and to attach thereto the seal of the Corporation. When so executed, such instruments shall be as binding as if signed by the President and attested to by the Secretary. Any power or authority granted to any representative or attorney-in-fact under the provisions of this article may be revoked at any time by the Board, the Chairman, the President or by the officer or officers granting such power or authority.

**ARTICLE XIII – Execution of Contracts: Section 5. Surety Bonds and Undertakings.**
Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

**Certificate of Designation** – The President of the Company, acting pursuant to the Bylaws of the Company, authorizes David M. Carey, Assistant Secretary to appoint such attorneys-in-fact as may be necessary to act on behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

**Authorization** – By unanimous consent of the Company's Board of Directors, the Company consents that facsimile or mechanically reproduced signature of any assistant secretary of the Company, wherever appearing upon a certified copy of any power of attorney issued by the Company in connection with surety bonds, shall be valid and binding upon the Company with the same force and effect as though manually affixed.

I, Renee C. Llewellyn, the undersigned, Assistant Secretary, The Ohio Casualty Insurance Company, Liberty Mutual Insurance Company, and West American Insurance Company do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy of the Power of Attorney executed by said Companies, is in full force and effect and has not been revoked.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and affixed the seals of said Companies this __5th__ day of __May__, 2021

By: _Renee C. Llewellyn_
Renee C. Llewellyn, Assistant Secretary

*Left margin:* Not valid for mortgage, note, loan, letter of credit, currency rate, interest rate or residual value guarantees.

*Right margin:* To confirm the validity of this Power of Attorney call 1-610-832-8240 between 9:00 am and 4:30 pm EST on any business day.

LMS-12873 LMIC OCIC WAIC Multi Co_12/19

Case 1:26-cv-00110    Document 1-2    Filed 04/28/26    Page 18 of 18    PageID #: 38